## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ROBERT C. AHDERS,** *et al.,* | | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| **SEI PRIVATE TRUST COMPANY,** | § | |
| **SEI INVESTMENTS COMPANY,** | § | |
| **CONTINENTAL CASUALTY** | § | **CIVIL ACTION NO: _____** |
| **COMPANY, CERTAIN** | § | |
| **UNDERWRITERS AT LLOYD'S OF** | § | **JURY DEMAND** |
| **LONDON, INDIAN HARBOR** | § | |
| **INSURANCE COMPANY, NUTMEG** | § | |
| **INSURANCE COMPANY, ALLIED** | § | |
| **WORD ASSURANCE COMPANY (U.S.)** | § | |
| **INC., and ARCH INSURANCE** | § | |
| **COMPANY,** | § | |
| *Defendants* | § | |
| | § | |

---

## COMPLAINT

---

Plaintiffs, as identified below, file this action complaining of Defendants SEI PRIVATE TRUST COMPANY, SEI INVESTMENTS COMPANY, CONTINENTAL CASUALTY COMPANY, CERTAIN UNDERWRITERS AT LLOYDS OF LONDON SUBSCRIBING TO POLICY NOS. FD0805144, FD0805145, FD08705146, AND FD0805514, INDIAN HARBOR INSURANCE COMPANY, NUTMEG INSURANCE COMPANY, ALLIED WORD ASSURANCE COMPANY (U.S.) INC., and ARCH INSURANCE COMPANY and for cause of action respectfully show as follows:

### INTRODUCTION

1. In February 2009, Stanford International Bank ("SIB") and Stanford Group Company ("SGC") were raided and shut down by federal authorities amid allegations that the entities had violated federal securities laws. Five principals of the Stanford companies were

subsequently indicted on multiple counts of fraud; two of the individuals pleaded guilty and the other three were convicted by juries after lengthy trials. All five are currently serving sentences in prison.

2.      At the time of the raid, $7 billion, consisting of certificates of deposits ("CDs") and accrued interest, was reflected on the books of SIB. In addition, SGC had investor accounts totaling approximately $10 billion. Investors regularly received statements advising them of the value of their holdings. While the statements regarding SGC investments accurately reflected the true value of those investments, statements regarding SIB CDs misrepresented the value of the CDs – far from the $7 billion reported to investors, the CDs were found to be worthless. As legal proceedings later made clear, the misrepresentations concerning the value of the CDs were at the center of one of the largest Ponzi schemes in United States' history.

3.      The victims of this massive fraud included retirees and other investors who purchased SIB CDs through their Individual Retirement Accounts (IRAs). Stanford Trust Company ("STC") was created in 1998 for the primary purpose of serving as the custodian for investors' IRA accounts. From STC's inception, these investors were misled concerning the value of their CDs. Defendants SEI Private Trust Company and SEI Investments Company (collectively "SEI") worked closely with STC to provide various accounting, processing and reporting functions on behalf of STC. Among other things, SEI generated and provided account statements to investors that materially misrepresented the value of their CDs. SEI, in furtherance of its own financial gain, aided and abetted STC in the sale and renewal of the SIB CDs.

## PLAINTIFF PARTIES

4.      The attached Appendix, incorporated by reference as if fully set forth herein, is a list of each of the Plaintiffs in this action.  Each of the named Plaintiffs is a person for whom STC purchased or renewed SIB CD's in Louisiana between January 1, 2007 and February 13, 2009.[1]  Collectively the Plaintiffs hold more than $30 million in claims.

5.      The Plaintiffs were class members in the action styled *Troy Lillie et al. v. Stanford Trust Co., et al.* no. 3:13-cv-03127 in the United States District Court for the Northern District of Texas.  On September 28, 2016 the Northern District of Texas issued an order titled, "Notice of Pendency of Class Action" notifying class members that a class had been certified, and of their right to opt out of the class.  Each of the Plaintiffs herein have timely complied with that order by executing the Exclusion Request provided, and returning it as instructed in the order.  The Plaintiffs now elect to pursue their claims in this lawsuit.

## DEFENDANT PARTIES

6.      Defendant **SEI Private Trust Company** is a limited purpose federal savings association and wholly owned subsidiary of the Defendant SEI Investments Company.  It is a Pennsylvania corporation with its principal office at 1 Freedom Valley Dr., Oaks, Pennsylvania 19456-9989.  It is registered to do, and actually does business in the state of Louisiana and may be served pursuant to the Louisiana Long Arm Statute.

7.       Defendant **SEI Investments Company** is a Pennsylvania corporation with its principal office at 1 Freedom Valley Dr., Oaks, Pennsylvania 19456-9989.  It is registered to do, and actually does business in the state of Louisiana and may be served pursuant to the Louisiana Long Arm Statute.

---

[1] Or the Plaintiff is the legal successor-in-interest of the person for whom Stanford Trust purchased or renewed a SIB CD during the relevant time period.

8.      Defendant **Continental Casualty Company** is an Illinois corporation with its principal place of business in Chicago, Illinois, and is registered to do, and actually doing business in Louisiana.  Pursuant to Louisiana Revised Statutes 13:3472 the Louisiana Secretary of State is designated as the agent for service of process, and process may be served upon Tom Schedler, Louisiana Secretary of State, 8585 Archives Ave., Baton Rouge, LA 70809. Continental issued to SEI, on a claims made basis, Errors and Omissions Liability Insurance Primary Policy No. 161804502 and First Excess Policy No. 268150789 for the policy period October 3, 2008 to October 3, 2009.

9.      Defendant **Certain Underwriters at Lloyd's London ("Lloyds")** is an unincorporated association with its members domiciled in the United Kingdom.  It is the underwriter for primary and excess policies of insurance benefiting SEI.  Pursuant to the service of suit clause in the policies of insurance, it may be served with process by serving Wilson, Elser, Moscowitz, Edleman & Dicker at 120 North LaSalle St., Chicago, Illinois 60602. Lloyd's issued to SEI, on a claims made basis, Errors and Omissions Liability Insurance Primary Policy No. FD0805144, First Excess Layer Policy No. FD0805145, Second Excess Layer Policy No. FD0805146, and Third Excess Layer Policy No. FD0805149 for the policy period October 3, 2008 to October 3, 2009.

10.     Defendant **Indian Harbor Insurance Company** is a Delaware corporation with its principal place of business in Stamford, Connecticut, and is registered to do, and actually doing business in Louisiana.  Pursuant to Louisiana Revised Statutes 13:3472 the Louisiana Secretary of State is designated as the agent for service of process, and process may be served upon Tom Schedler, Louisiana Secretary of State, 8585 Archives Ave., Baton Rouge, LA 70809. Indian issued to SEI, on a claims made basis, Errors and Omissions Liability Insurance Primary

Policy No. ELU107581-08 and First Excess Layer Policy No. ELU107582-08 for the policy period October 3, 2008 to October 3, 2009.

11.     Defendant **Nutmeg Insurance Company** is a Connecticut corporation with its principal place of business in Hartford, Connecticut, and is registered to do, and actually doing business in Louisiana.  Pursuant to Louisiana Revised Statutes 13:3472 the Louisiana Secretary of State is designated as the agent for service of process, and process may be served upon Tom Schedler, Louisiana Secretary of State, 8585 Archives Ave., Baton Rouge, LA 70809. Nutmeg issued to SEI, on a claims made basis, Errors and Omissions Liability Insurance First Excess Layer Policy No. 00DC013126808 and Second Excess Layer Policy No. 00DC022285308 for the policy period October 3, 2008 to October 3, 2009.

12.     Defendant **Allied World Assurance Company (U.S.) Inc.** is a Delaware corporation with its principal place of business in New York, New York, and is registered to do, and actually doing business in Louisiana.  Pursuant to Louisiana Revised Statutes 13:3472 the Louisiana Secretary of State is designated as the agent for service of process, and process may be served upon Tom Schedler, Louisiana Secretary of State, 8585 Archives Ave., Baton Rouge, LA 70809. Allied issued to SEI, on a claims made basis, Errors and Omissions Liability Insurance First Excess Layer Policy No. C008291/002, Second Excess Layer Policy No. C008295/002, and Third Excess Layer Policy No. C008293/002 for the policy period October 3, 2008 to October 3, 2009.

13.     Defendant **Arch Insurance Company** is a Missouri corporation with its principal place of business in Jersey City, New Jersey, and is registered to do, and actually doing business in Louisiana.  Pursuant to Louisiana Revised Statutes 13:3472 the Louisiana Secretary of State is designated as the agent for service of process, and process may be served upon Tom Schedler,

Louisiana Secretary of State, 8585 Archives Ave., Baton Rouge, LA 70809. Arch issued to SEI, on a claims made basis, Errors and Omissions Liability Insurance Second Excess Layer Insurance Policy No. IAP0030255-00 and Third Excess Layer Policy No. IAP0030256-00 for the policy period October 3, 2008 to October 3, 2009.

## JURISDICTION

14.     This court has jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1332(a)(3) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because each Plaintiff is a citizen of a different state than the domestically domiciled defendants and the association Certain Underwriters at Lloyd's London are subjects of a foreign state.

15.     This court has personal jurisdiction over each of the Defendants under the Louisiana Long Arm Statute, Louisiana Revised Statutes 13:3201(B), and under the United States Constitution because each of the Defendants has purposely availed itself of the privilege of conducting business within the State of Louisiana.

## FACTS

### The Stanford CD

16.     In 1986, Allen Stanford began operating an international bank from the Caribbean island of Montserrat.  Initially named Guardian International Bank, the bank was subsequently moved to Antigua and renamed Stanford International Bank Limited ("SIB").  During the years that followed, Allen Stanford established additional financial service companies that had clientele throughout the world.[2]  Stanford Group Company ("SGC") and Stanford Trust Company ("STC") were two such companies.  SGC was a broker/dealer that began its U.S.

---

[2] Ultimately, there were more than 80 operating companies worldwide.  To avoid confusion, the companies will be referred to collectively in this Complaint as "Stanford Financial" or "Stanford."  Allen Stanford will be referred to as "Allen Stanford."

operations in 1995.  STC was chartered in Louisiana in 1998 and operated as a Louisiana Trust Company.  It was based in Baton Rouge and served as a custodian for IRAs that held SIB CDs. Together, SIB, SGC and STC experienced consistent and impressive growth in their collective CD sales – by 2008, SIB books showed over $7 billion in customer deposits.

17.    While referred to as a "CD," the SIB CD was unlike conventional CDs issued by U.S. banks.  The CDs offered and sold by STC and SIB constitute "securities" under state and federal securities laws.  SIB, and its agents including SGC and STC, marketed the CDs to investors in the United States as a security pursuant to a Regulation D private placement.  In connection with the private placement, SIB filed several Forms D with the United States Securities and Exchange Commission.  The CDs were not insured by the FDIC, or guaranteed by any similar government regulatory insurance regime.

18.    Funds received from investors were pooled and purportedly invested in various investments.  The sales literature for the CD touted the product's safety.  Purchasers were told that money from the sale of CDs was allocated in a portfolio that contained equity, fixed income, alternative investments and precious metals.[3]  SIB's annual report generally described the portfolio with some details about the investments, although the exact holdings of the portfolio were not disclosed to the financial advisors and investors.[4]  Investors were also told that the portfolio was managed by several European money managers.

19.    Financial advisors and the investors regularly reviewed account statements that claimed to represent the value of the SIB CDs.  SEI prepared and sent the statements for IRA accounts held through STC.

---

[3] Similarly, the financial advisors were instructed in their training manual, under the heading "SECURITY," that SIB "invests most of its assets in securities such as bonds and equities that are marketable instruments, negotiable in financial markets and easy to liquidate."

[4] The reason Laura Pendergest-Holt gave to the financial advisors was that the portfolio was traded on the basis of a proprietary system that would lose its advantage if divulged.

## The Fraud

20.     The above representations about SIB's portfolio, furnished to financial advisors and investors, were clearly false.  What the financial advisors and investors did not realize was that the funds were not invested as described in the literature and did not have the value reflected in SEI's account statements.  Almost all of SIB's funds were invested in private companies, companies that were traded over-the-counter or in the "pink sheets," real estate, and a $2 billion loan to Allen Stanford.  In short, Stanford employees and investors were deceived about Stanford's business model, investment strategy, financial strength and the safety and nature of the investments.  These lies were repeated and validated by SEI's materially misleading statements of value.

21.     In order to mask the fraud, revenue figures for SIB's assets were "reverse engineered" to arrive at desired levels.  James Davis, the Chief Financial Officer of Stanford Financial Group Limited ("SFGL"), oversaw the fabrication of the SIB financial statements. After it was determined what level of revenue SIB needed to report in order to look good to investors, Davis' team would back into that total amount by assigning fictitious revenue amounts to each category (equity, fixed income, precious metals, alternatives) of a fictitious investment allocation.

22.     In February, 2009 the United States Securities Exchange Commission (SEC) raided SGC and SIB, and quickly confirmed that SIB had nothing resembling $7 billion in safe, liquid investments.  On February 6, 2009, the SEC filed suit against SIB and related entities alleging fraud in connection with the issuance of CDs.  This led to the Court freezing the assets of Stanford Financial and appointing a receiver to manage and distribute the assets of Stanford Financial.  The SEC issued statements alleging that Stanford Financial operated as a "massive

Ponzi scheme," misappropriated billions of dollars of investors' money, and that "Stanford International Bank's financial statements, including its investment income, are fictional."

23.     Jim Davis, Laura Pendergest-Holt, the Chief Investment Officer of SFGL, Gil Lopez and Mark Kuhrt, SFGL accountants, and Allen Stanford, CEO and the ultimate shareholder of SIB and STC, were all implicated in the fraud.  Davis and Holt pled guilty to federal charges and are serving sentences of five years and three years, respectively.  Lopez, Kuhrt and Stanford were each found guilty following lengthy trials and were sentenced to 20 years (Lopez and Kuhrt) and 110 years (Stanford).

24.     In related civil litigation, the United States District Court for the Northern District of Texas, in the case of *In re: Stanford International Bank, Ltd.,* Case Nol. 3:09-cv-00721-N, United States District Court, Northern District of Texas, Dallas Division, Doc. No. 176, p. 19, determined that a Ponzi scheme existed in its order dated July 30, 2012. In that order, Judge Godbey stated the following:

> The Court has previously stated that Stanford operated a Ponzi scheme. See, e.g., Order, Mar. 31, 2011 [1310], in SEC action ("The court previously determined that the Stanford Defendants operated a Ponzi scheme." (citing order Granting Prelim, Inj., June 10, 2010 [456], in Janvey v. Alguire, Civil Action No. 3:09-cv-0724 (N.D. Tex. Filed Apr. 20, 2009.), aff'd, 628 F3d 164 (5th Cir. 2010))). Although the Court acknowledges that it may have been inconsistent in recent orders by sometimes referring to the scheme as an "alleged Ponzi scheme," see, e.g., Order Denying Stanford's Mot. Dismiss, at 13 ("Stanford's alleged Ponzi scheme spanned at least a decade and involved myriad actors and entitles largely owned or controlled by Stanford."), the Court here clarifies that it holds that Stanford operated a Ponzi scheme.

### The Role of SEI

25.     The claims brought in this lawsuit relate to the role of SEI in running STC and the failure of SEI to perform due diligence in determining the value of the SIB CDs on which SEI regularly reported to the Plaintiffs.

26.    SEI ignored red flags about the legitimacy of the SIB CDs because it gained financially from the increased CD sales; it put its profits before the interests of the investors. STC entered into standardized agreements with each Plaintiff. In exchange for annual account fees, administrative and other fees paid by the Plaintiffs, STC undertook the responsibility of acting as custodian of the IRA accounts.

**SEI was inextricably intertwined with STC**

27.    STC was a startup trust organization when it became a client of SEI in 1998.  STC had little or no expertise in trust operations. SEI provided Stanford the expertise to initially set up the IRA accounts, provide the accounting, and to provide monthly accounting of the values. By providing essentially all of the trust's operational skills to STC, SEI was the *de facto* trust company and enabled STC to effect the offering of SIB CDs to Plaintiffs without complying with the registration laws or properly valuing the SIB CDs.

28.    STC could not have functioned without the proprietary operational expertise and functions provided by SEI.  While STC and SEI shared in the responsibilities for serving as custodian of the SIB CDs, in reality SEI was responsible for the essential custodial functions. Without the efforts of SEI, STC would have been unable to sell a single CD.

**SEI provided cradle-to-grave trust management for STC**

29.    SEI is a leading global provider of asset management, investment processing and investment operations solutions. SEI provided investment processing, fund processing, and investment management business solutions to STC from "cradle-to-grave" by utilizing SEI's proprietary software system, all of which allowed STC to outsource trust and investment related activities.

30.    SEI, in its own literature, states that it is a "leading global provider of asset management, investment processing, and investment operations solutions for institutional and personal wealth management that helps private banks, investment advisors, investment managers, institutional investors and affluent individuals create and manage wealth.

31.    SEI Private Trust Company is a trust company licensed and regulated by the federal government and under the supervision of the Office of the Comptroller of the Currency – not a mere bookkeeping service. SEI has a special expertise in the management, administration, and reporting of IRA accounts.

**SEI had custodial responsibilities for reporting to investors**

32.    SEI provided full support for the trust operations of STC. SEI regularly reported to the Plaintiffs on the fair market value of the SIB CDs held in their IRA accounts from 1998 to the date of the closing of STC in February of 2009.

33.    When STC served as a custodian of an IRA account, the only security that was purchased for each IRA account was the SIB CD. Thus, SEI was only required to value the SIB CD in rendering its monthly statement to Plaintiffs.

34.    SEI and STC entered into an agreement in which SEI would perform the trust functions of accounting and reporting of STC investments in SIB CDs.

35.    SEI, through its subsidiary, SEI Trust, executed a contract with STC in 1998 in which SEI performed various services for STC and was responsible for reporting the value of the CDs issued by SIB to the Plaintiffs and other IRA owners on a monthly and quarterly basis.

36.    SEI prepared the monthly and quarterly reports to each STC account holder, which listed the value of the SIB CDs held in such account.

37.     SEI reported on the value of the SIB CDs to the Plaintiffs on a monthly and/or quarterly basis since STC's inception in 1998 until its demise on February 17, 2009.

38.     Through its reporting responsibilities, SEI played a vital and substantial role in the sale and marketing of the unregistered SIB CDs to the Plaintiffs by providing the platform and expertise, from the inception of STC, to implement the deceptive scheme against the Plaintiffs. SEI further confirmed the deceptive plan by reporting monthly values to the Plaintiffs that were, at their base level, material misstatements of the value of the SIB CDs.

39.     Plaintiffs and their financial advisors relied upon these false statements in making decisions to purchase and renew SIB CDs.

40.     Financial advisors who recommended that their clients purchase SIB CDs were deceived by the misrepresentations contained in the SEI statements, and relied upon those false statements in recommending that their clients purchase or renew CDs.

41.     Plaintiffs were deceived and relied upon the misrepresentations contained in the SEI statements, by reviewing the statements directly and/or by relying upon advisors who read and relied upon the false SEI statements.

42.     SEI was required to provide Plaintiffs and STC with account statements that reflected the value of the assets in the Plaintiffs' IRA accounts, including the SIB CDs, which must be reported as accurately as possible using the resources available to it. SEI was to provide Plaintiffs and STC with monthly or quarterly account statements purportedly reflecting the value of the IRA, when in the fact those accounts had little or no value because SIB had nonexistent assets. SEI violated its duty to Plaintiffs by providing Plaintiffs with inaccurate account statements and maintaining inaccurate fiduciary books and records.

**SEI was responsible for reporting the market value of the CDs to the IRS for Plaintiffs**

43.    As part of its custodial duties, SEI was responsible for providing the market value of the CDs to the IRS on an annual basis on behalf of Plaintiffs.

44.    The SEI Contract stated that SEI was responsible for the preparation and filing of all U.S. tax forms for each IRA account holder. The SEI Contract stated the following scope of service: "Regulatory Reporting…5498, Annual Trust Department Report" which included the preparation of item 5 of IRS Form 5498 entitled "Fair Market Value of the Account."

45.    The reports provided to the IRS by SEI falsely and materially misrepresented the value of the SIB CDs.

46.    The IRS reports prepared by SEI were reviewed by Plaintiffs and their advisors, who relied upon the materially misleading statements concerning the value of SIB CDs.

47.    Plaintiffs and their advisors relied upon the misleading statements in SEI's reports to the IRS in making decisions to purchase and renew SIB CDs.

48.    Financial advisors who recommended that their clients purchase SIB CDs were deceived by the misrepresentations contained in SEI's reports to the IRS, and relied upon those false statements in recommending that their clients purchase or renew CDs.

49.    Plaintiffs were deceived and relied upon the misrepresentations contained in SEI's reports to the IRS, by reviewing the statements directly and/or by relying upon advisors who read and relied upon the false SEI statements.

**The false statements prepared by SEI reassured investors that their CDs were "safe"**

50.    SEI put its internationally known and respected brand name behind STC and SIB, thereby lending recognition and credibility to Stanford Financial, STC, and SIB, and supporting their sales efforts.

51.     SEI consistently, year after year, allowed its name to be mentioned prominently in SIB's Annual Reports, alongside Allen Stanford and Jim Davis and the rest of the SIB Board of Directors and the management of SIB, therefore lending more legitimacy to the overall operations of SGC, STC, and SIB.

52.     At the time of the purchase and renewal of the SIB CDs, Plaintiffs were reassured of the safety of the SIB CDs.  Had the value of the SIB CDs been reported correctly by SEI at the time of the purchase or the renewals of the SIB CDs, the Plaintiffs would not have purchased or renewed the SIB CDs.  In the alternative, had the value of the SIB CDs been reported correctly by SEI, the SIB CDs could have been liquidated prior to maturity and some or all the loss could have been avoided.

53.     Because of the lack of disclosure of material information and the risks associated with the SIB CDs by SEI, Plaintiffs misunderstood or simply did not know the risks inherent in an investment in the SIB CDs.  In truth and in fact, SIB was a "Ponzi scheme" which used cash flow realized from the proceeds of the sale of other SIB CDs to new investors to pay interest income on the older SIB CDs rather than the actual cash income generated from the investments of SIB.  SEI regularly reported fake and misleading values to investors, assisting STC with its fraud.

54.     SEI knew that Plaintiffs would and did rely on the monthly and quarterly reports and annual IRA Tax Reports being prepared and distributed by SEI in making their investment decisions concerning buying the SIB CDs; indeed, the very purpose of the reports rendered by SEI was to influence the investors' decision-making process in favor or purchasing and continuing to hold SIB CDs.

55.    Plaintiffs have been damaged as a result of SEI failing to properly report the value of the SIB CDs. SEI made no attempt to require STC to register the securities with the Commissioner of Securities as a public offering despite the fact SEI knew or should have known that the securities were being sold to non-accredited investors.

**SEI failed to perform due diligence before it reported the value of the SIB CDs**

56.    SEI had knowledge that the SIB CDs were being marketed to individual investors, who had trust accounts because the primary valuation and reporting performed by SEI was for those investors. SEI had full knowledge that the services it was performing were directly for, and in connection with the offering of the SIB CDs and was an integral part of the process used by SGC and STC to promote and sell SIB CDs. SEI had full knowledge that the offering was not registered.

57.    SEI understood the Stanford Financial business model from its review of Stanford prior to becoming the *de facto* custodian for the STC accounts.

58.    SEI understood that a substantial portion of Stanford Financial revenue was derived from the sale of SIB CDs.

59.    SEI has sophisticated software programs that can evaluate money managers and investment funds.

60.    SEI regularly monitors the performance of hundreds of investment funds and managers on an annual basis.

61.    SEI did not know of any other CDs that generated the returns as reported by SIB from 1998 through 2008.

62.    SEI had a duty to accurately report information to Plaintiffs.

63.     SEI had a duty to correct any information that it provided to Plaintiffs which it later believed was inaccurate.

64.     SEI performed no due diligence in connection with the SIB CDs.

65.     SEI did not know of any other investment funds that generated the returns reported by SIB from 1998 through 2008.

66.     SEI did not perform a search on Laura Pendergest-Holt using SEI software.

67.     SEI did not perform a search on James Davis using SEI software.

68.     SEI did not perform a search on Juan Rodriguez Tolentino using SEI software.

69.     SEI did not perform a search on SIB using SEI software.

70.     SEI did not perform a search on STC using SEI software.

71.     SEI did not perform a search on SGC using SEI software.

72.     SEI performed no due diligence in conjunction with "determining the positive or negative cash flow of the operations of Stanford International Bank."

73.     SEI performed no due diligence in conjunction with "determining the extent of the liabilities of Stanford International Bank."

74.     SEI performed no due diligence "to determine the value of any of the assets of Stanford International Bank."

75.      SEI performed no due diligence "to determine the extent of any loans made by Stanford International Bank to Allen Stanford individually."

76.     SEI performed no due diligence in conjunction with the "risk profile of the SIB certificates of deposit."

77.     SEI performed no due diligence in connection with the "Stanford Trust bank's compliance with the Louisiana Trust law."

78.     Because of SEI's involvement in each of the IRA accounts of STC, SEI was clearly on notice that the investing public, who were being actively solicited to purchase SIB CDs, were being offered securities. SEI made no attempt to determine whether the offering was a public offering or whether the offering to the Plaintiffs met the proper disclosure requirements.

79.     SEI performed no due diligence in conjunction with the "the operations of Stanford Trust to determine whether the marketing of the SIB securities to the IRAs were in compliance with the federal securities law."

80.     SEI performed no due diligence in connection with "the financial condition of Stanford International Bank."

**SEI ignored the risks of the CD and damaged Plaintiffs**

81.     STC indirectly received commission income from the sale of the SIB CDs because the income realized by the parent company, Stanford Group Holdings, Inc., from SIB was used to pay the overhead and operation of STC.  STC was an integral part of the SIB CD scheme.  SEI failed to inquire about material facts and risks of the SIB CDs that SEI should have known and understood given its role of reporting the values to the Plaintiffs.

82.     SEI substantially assisted and was a substantial factor in enabling SGC and STC to perpetrate the massive Ponzi scheme now alleged by the SEC and that allowed the purchase of worthless CDs by Plaintiffs.

83.     SEI is directly liable for the acts and omissions of any subsidiary that performed any of these functions or failed to perform any of these functions and each subsidiary is the alter ego of SEI and conducted the business including the schemes described herein. Specifically, SEI owns, controls, and dominates each subsidiary listed on its website under www.SEIC.com to such an extent that all subsidiaries in reality function as a mere division or branch of SEI. Indeed,

SEI and all of its subsidiaries operate as one single unified worldwide business unit or single business enterprise, all operating under the SEI brand, international trademark or trade name and logo, which is prominently displayed on all of the SEI documents and advertising. SEI controls the manner in which its subsidiaries are perceived by the public and therefore intentionally creates the impression in the minds of third parties that SEI is one unified, global entity that acts as a single unit. SEI's own website touts its global approach to client service, in which SEI combines its global resources to offer the full benefit of every service that SEI offers worldwide.

**SEI knew that there were no credible valuations of the SIB CDs**

84.     At least as early as 2005, SEI knew that no valuations existed of the SIB CDs. The 2005 Examination Report, prepared by the Office of Financial Institutions for the State of Louisiana, stated the following: "STC had IRA accounts holding closely held stock, limited partnerships, and real estate. While market values on these unique assets may not be easily ascertainable, it is required for accurate reporting to the account holder, as well as various state and federal agencies."

85.     As of the 2006 Examination Report, OFI continued to be aware that "Deficiencies noted in the accounts related to updating the current market value of assets held in the accounts. Regulations LRS 9:2088 requires 'accurate annual accounting to clients'; and IRC 408 requires reporting current market value on form 5498. (administrator had correspondence requesting updates)."

86.     Investments in SIB CDs by STC for the IRAs and sales in the State of Louisiana continued in 2007. The 2007 Exam report stated the following:

> *STC continues to open and administer self-directed IRA accounts referred through its affiliate, SGC. These accounts hold unique items, including SIB CDs, real estate, stock of closely held companies, and stock in limited liability partnerships. ..... The market values had not changed, and no financial*

*information was found in files. In addition, due to the uniqueness of the SIB CDs, an independent valuation of these assets should be conducted as well. Valuations are required in order to ensure the accuracy of reports provided to accountholders under State Law as well a filing with the Internal Revenue Services (IRS). (Plaintiffs' Exhibit 127-OFI040632).*

87.    As of the 2007 Exam, "STC currently had $310 million in assets under management consisting of $263 million in self-directed IRAs… The SEI Investments Manager Selection and Monitoring system remains in place. Profiles are taken and then various recommendations are presented to the clients for their approval."

88.    The 2007 Exam report further noted that "As of June 30, 2007, self-directed IRA accounts concentrated in SIB CDs represented 72.8 percent of total trust assets compared to 49 percent at the previous examination. We are concerned with the lack of diversification and apparent risk associated with this growing concentration. Specifically, the rapid proliferation of the SIB CDs without proper due diligence and ongoing reviews of SIB is exposing STC to an undue level of risk to its reputation and capital."

89.    SEI continued to report the values of the SIB CDs at 100% of their face amount.

90.    From 2005 until 2009, the SIB CDs owned by STC increased from approximately $97 million to approximately $300 million. At all times, SEI knew that no independent valuation existed on the SIB CDs.

## INSURANCE COVERAGE

91.    The SEI insurers, including Continental, Lloyds, Indian, Nutmeg, Allied and Arch, provided errors and omissions insurance coverage to SEI on a claims made basis for the policy period October 3, 2008 to October 3, 2009 under their respective policies. Continental, Lloyds, and Indian were the primary insurers providing a total of $15,000,000 in primary

coverage. Continental, Nutmeg, Lloyds, Allied and Indian were the insurers providing the first layer of excess coverage to SEI in the total amount of $10,000,000. Nutmeg, Lloyd, Allied and Arch were the insurers providing the second layer of excess coverage to SEI in the total amount of $25,000,000. Lloyds, Allied and Arch were insurers providing the third layer of excess coverage to SEI in the total amount of $25,000,000.

92.     In addition, Continental primary errors and omissions liability policy no. 161804502 issued to SEI provides an expanded primary limit of $40,000,000 when the claims are based on the provision of professional services by SEI to an investment company. Such facts are present here and, as a result, the expanded primary limit is applicable.

93.     Certain damages have occurred to the Plaintiffs during the policy periods of the policies of insurance issued by the SEI insurers as a result of the acts and omissions of SEI as set forth in detail in paragraphs 1 to 92 herein.

94.     SEI insurers insured against the damages sought herein and are liable for the damages caused by SEI.

## CAUSES OF ACTION

### COUNT I:

### SEI VIOLATION OF THE LOUISIANA SECURITIES LAW

95.      Paragraphs 1 to 94 are incorporated herein by reference.

96.     SEI has violated the Louisiana Securities Law as set forth herein. SEI has liability for the sales of the SIB CDs by STC under the Louisiana Securities Law based upon Section 714(B) as a participant in the sale of unregistered securities by STC and SGC.

97.     STC entered into contractual agreements with SEI to administer and report to Plaintiffs the performance and value of the SIB CDs. The reporting of the SIB CDs was the primary function performed by SEI and was the primary, if not sole security, that it was required to administer and report upon. Obtaining a company to perform this role on behalf of STC was a key component in promoting the sale of the SIB CDs to retirees, who rolled their IRAs over into STC as alleged herein. SEI received substantial income for performing this function. Because this was the primary security that it was required to administer, SEI had a heightened duty to understand the nature of the SIB CD and to understand the manner in which it was being offered to Plaintiffs and the manner in which it was valued on the reports rendered to Plaintiffs.

98.     SEI knew, based on its continual reporting of values to Plaintiffs, at all times that the SIB CDs were being marketed to Plaintiffs who were retirees in most instances, and that many of these individuals had rolled their IRA retirement funds into the IRA accounts that SEI administered for STC. Further, SEI knew that STC and SGC had not filed a registration statement with the State of Louisiana or the Securities Exchange Commission because of its intimate involvement in the operation of STC. Further, SEI knew that STC was experiencing major internal control issues based upon its participation in the resolution of these issues, but made no attempt to assure that the Plaintiffs were aware of these issues.

99.     STC sold securities to Plaintiffs, within the meaning of the terms "sale" and "security" as defined in Section 702 of the Louisiana Securities Law. STC sold these securities by means of untrue statements of material fact and/or omissions of material facts, which made their statements misleading in light of the circumstances in which they were made.

100.    As a participant in the offering, and through its knowledge of the registration process because SEI was a public company registered under the Securities Exchange Act of

1934, SEI made no attempt to determine the accuracy of the information that was being given to the Plaintiffs by STC or to determine what information was omitted from the offering documents or whether the securities should have been registered which would have required disclosure of the underlying assets of SIB.

101.    These misrepresentations and omissions were in violation of Section 712 of the Louisiana Securities Law.

102.    SEI participated in the sale of securities that were not registered in accordance with the law of the State of Louisiana and were not subject to a private placement exemption under the laws of the State of Louisiana. SEI participated in the sale of securities to Plaintiffs, who did not meet the non-public offering requirements and who were not sophisticated investors.

103.    The failure to register the securities being marketed to Plaintiffs was in violation of Sections 705 and 712 of the Louisiana Securities Law. SEI is liable based upon Section 714(A) and (B) of the Louisiana Securities Law.

104.    SEI played a vital and substantial role in the sale and marketing of the unregistered SIB CDs to the Plaintiffs. Had the securities been registered, the assets of SIB would have been disclosed, and Plaintiffs would have been able to make an informed decision on the value of the SIB CDs.

105.    Plaintiffs relied on the foregoing material representations and/or omissions to their detriment.

106.    SEI participated, directly and indirectly, in the preparation, dissemination of written offering documents, promotional materials, investor and other correspondence, and oral presentations, in the solicitation of the IRA accounts of the Plaintiffs, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

107.    SEI could have discovered all of the misrepresentations and omissions including the failure to register the SIB CDs by exercising the due care required under 714(B) of the Louisiana Securities Law.

108.    In accordance with Sections 712(D) and 714(B) of the Louisiana Securities Law, every company who participates in any material way in the sale is liable jointly and severally with and to the same extent as the persons liable under 714(A) unless such person sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist. Based upon the role of SEI, SEI participated in the offering of the SIB CDs in a material way based upon the allegations set forth herein and is jointly and severally liable.

109.    SEI could have, in the exercise of reasonable care, determined the existence of the facts set forth in Paragraphs 1 to 108 or in the alternative, determined the omission of certain facts that was making the offering of the SIB CDs misleading.

110.    SEI was occupying a similar status or performing similar functions as STC under Section 714(B) of the Louisiana Securities Law and, as a result, a duty exists for SEI to inquire about the assets supporting the SIB CDs.

111.    SEI is liable for all securities law violations of STC.

112.    SEI, in the course of its business relationships with SGC and STC, made material representations to Plaintiffs on a monthly and quarterly basis based upon the value of the SIB CDs. SEI and its employees and agents knowingly made the misrepresentations contained in said reports as positive assertions without knowledge of their truth.

113.    Acting on behalf of SGC and STC and at its behest, SEI created and transmitted monthly and quarterly reports to each Plaintiff with the intention that investors like Plaintiffs act upon the representations by investing in, or continuing to maintain investments in, SIB CDs. Plaintiffs received the reports created and transmitted by SEI and STC, formed the belief that the SIB CDs were legitimate investments and valued correctly.

114.    As a direct and proximate result of Plaintiffs' reliance on SEI's fraudulent misrepresentation, Plaintiffs suffered damages, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

115.    As a result of the foregoing violations of the Louisiana Securities Law, Plaintiffs have sustained actual damages and are entitled to actual damages in an amount to be shown at the trial of this matter.


## COUNT II:

### CLAIM AGAINST INSURERS BY PLAINTIFFS UNDER THE LOUISIANA DIRECT ACTION STATUE

116.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 115 above as though fully set forth herein.

117.    During the policy period October 3, 2008 to October 3, 2009, the SEI insurers, including Continental, Lloyds, Indian, Nutmeg, Allied and Arch, provided errors and omissions liability coverage to SEI on a claims made basis. Each of the errors and omissions liability policies issued by the SEI insurers provides coverage for the damages sought herein by the Plaintiffs and caused by SEI.

118.     In truth and in fact, Continental, one of the primary insurers of SEI, has admitted that coverage exists for the Plaintiffs' claims  under  policy number 161804502 issued to SEI. As a result, all excess policies following this form have also admitted coverage for the claims of Plaintiffs.

119.     All claims being asserted by Plaintiffs hereunder against any Insurer for any insurance coverage provided to SEI is being asserted by Plaintiffs against the Insurers under the Louisiana Direct Action Statute for any coverage provided to SEI by Insurers.

120.     As a result, the Insurers are liable for all foreseeable and unforeseeable damages to Plaintiffs under the Louisiana Direct Action Statute caused by SEI.

## DAMAGES

121.     As a direct, foreseeable and proximate result of SEI's actions, the Plaintiffs have suffered significant injury.  They have lost the value of their IRA investments in SIB CDs, and are entitled to a return of their principal.  Plaintiffs are also entitled to be compensated for the loss of use of their funds.

## CONDITIONS PRECEDENT

122.     All conditions precedent to Plaintiffs' right to recover as requested herein have occurred or been satisfied.

## JURY DEMAND

123.     Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38.

## PRAYER

WHEREFORE, Plaintiffs request that Defendants be cited to appear and answer and, on final trial, that Plaintiffs have judgment against Defendants for the following:

a.    Actual economic damages;

b.    Exemplary damages as allowed by law;

c.    Costs and attorneys' fees;

d.    Pre-judgment and post-judgment interest as allowed by law; and

e.    All other relief in law or in equity to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

EZELL LAW FIRM, LLC

/S/ Bevan W. Sabo
Bevan W. Sabo (35995)
10761 Perkins Road, Suite A
Baton Rouge, Louisiana 70810
Phone:  (225) 763-2272
Fax:  (225) 763-2273
Email: bsabo@ezellfirm.com

**OF COUNSEL:**

/s/      *Michael J. Stanley*
Michael J. Stanley
mstanley@stanleylaw.com
STANLEY, FRANK & ROSE LLP
7026 Old Katy Rd., Suite 259
Houston, Texas 77024
Tel: 713-980-4381 ▪ Fax: 713-980-1179